UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUL 9 - 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| TIFFANY HUTIRA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action Number 01-883 (RCL) |
| ) | |
| THE ISLAMIC REPUBLIC OF IRAN ) | |
| & THE IRANIAN MINISTRY OF ) | |
| INFORMATION AND SECURITY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This matter comes before the Court on non-party David Ottaway's Motion to Quash

Deposition and Document Subpoena, filed on May 8, 2002. In the motion, Ottaway (who is a

reporter for The Washington Post) seeks an order from this Court quashing a subpoena served on

him by the plaintiff based on "the First Amendment reporter's privilege." Mot. to Quash at 4.

The plaintiff filed a response to the motion on May 21, 2002, and Ottaway filed a reply on June

3, 2002. After a thorough review of the memoranda filed in support of and in opposition to the

motion, the applicable law, and the record in this case, the Court finds that the motion to quash

should be GRANTED.

## I.   BACKGROUND

Tiffany Hutira filed the instant action against the Islamic Republic of Iran and its Ministry

of Information and Security under the Foreign Sovereign Immunities Act ("FSIA"). In the

complaint, Hutira alleges that the defendants "order[ed]" and "arrang[ed] for" the assassination

of her father, Ali Tabatabai, who at the time of his death was a dissident of the Iranian

government living in the United States. Tabatabai was reportedly murdered at his Bethesda,

15

Maryland home in 1981 by Daoud Salahuddin, who allegedly acted at the direction of and received material support from the Iranian government. The defendants, despite being properly served with process, have failed to enter an appearance in this matter. As a result, the Court entered default against both defendants on December 26, 2001, pursuant to 28 U.S.C. § 1608(e) and Federal Rule of Civil Procedure 55(a). Notwithstanding indicia of the defendants' willful default, however, the Court cannot enter a judgment by default against the defendants until the plaintiff has "establishe[d] h[er] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

On August 25, 1996, The Washington Post published an article written by Ottaway entitled "The Lone Assassin." The article chronicled the gruesome details of Tabatabai's assassination, including the involvement of the Iranian government. Specifically, the article recounts how Salahuddin was initially contacted by a "handler" from the Iranian Interest Section at the Algerian Embassy. The handler allegedly gave Salahuddin a list of potential assassination targets which included Tabatabai. The article describes how in exchange for Salahuddin's promise to kill Tabatabai, the handler--who, according to Salahuddin was acting on orders from Ayatollah Khomeini[1] himself--agreed to pay Salahuddin several thousand dollars (to cover his expenses) and send him to China to study medicine and boxing. Salahuddin apparently received the money, committed the crime, and fled to Iran (where he now resides). The article also identifies several individuals that had or have knowledge of the relevant events surrounding Tabatabai's assassination.

In order to obtain evidence establishing her claim or right to relief that is satisfactory to

---

[1]Ayatollah Khomeini was the leader of the Islamic Republic of Iran at this time.

the Court, see 28 U.S.C. § 1608(e), Hutira served a subpoena on Ottoway that requires him to produce certain documents and to be deposed. Specifically, the subpoena requests "all documents . . . relating or pertaining to" Daoud Salahuddin, individuals mentioned in the "The Lone Assassin," and the article itself. Although the subpoena does not specify, any deposition of Ottoway would presumably cover similar topics. The plaintiff has indicated that ultimately she only wants Ottoway to confirm the accuracy of certain statements and quotations in his article. In his motion to quash, Ottoway argues that "[e]ven applying that limitation, however, Plaintiff's attempt to compel such testimony runs afoul of the First Amendment reporter's privilege." Mot. to Quash at 4. The Court will address the merits of Ottoway's motion below.

## II.   DISCUSSION

A.    Qualified Privilege for Journalists under the First Amendment

The Federal Rules of Civil Procedure, which govern civil actions in federal court, provide that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Fed. R. Civ. P. 26(b)(1). This broad standard reflects the "fundamental principle of [American] jurisprudence that the 'public . . . has a right to every man's evidence.'" von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987) (quoting United States v. Bryan, 339 U.S. 323, 331 (1950)). Consistent with this principle, "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." United States v. Nixon, 418 U.S. 683, 710 (1974).

Despite this rule and its underlying principle, courts have recognized that the First Amendment provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities. See, e.g., Zerilli v. Smith, 656 F.2d

-3-

705, 711 n. 39 (D.C. Cir. 1981) (noting that "[t]he Supreme Court [has] explicitly acknowledged

the existence of First Amendment protection for news gathering" activities.); Carey v. Hume, 492

F.2d 631, 636 (D.C. Cir. 1972) (same). "Rooted in the First Amendment, the privilege is a

recognition that society's interest in protecting the integrity of the newsgathering process, and in

ensuring the free flow of information to the public, is an interest of sufficient social importance

to justify some incidental sacrifice of sources of facts needed in the administration of justice."

Shoen v. Shoen, 5 F.3d 1289, 1292 (9th Cir. 1993) (internal citations omitted). See also Zerilli,

656 F.2d at 711 (noting that "[w]ithout an unfettered press, citizens would be far less able to

make informed political, social, and economic choices."). The privilege is not absolute,

however, and may be abrogated upon a sufficient showing by the party seeking the information.

Carey, 492 F.2d at 636.[2]

     In determining whether the privilege applies in a civil action,[3] the court must look to the

---

[2]Judge (later Justice) Stewart, writing for the Second Circuit, explained why the privilege is not absolute in Garland v. Torre, 259 F.2d 545 (2d Cir. 1958). He wrote that:
> [f]reedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press. It would be a needless exercise in pedantry to review here the historic development of that duty . . . [Moreover,] [t]he right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.
Garland, 259 F.2d at 548-49 (internal citations omitted).

[3]The applicability of the privilege in criminal cases is governed by Branzburg v. Hayes, 408 U.S. 665 (1972). In that case, the Supreme Court "held that a journalist does not have an absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation, despite potential interference with news gathering." Zerilli, 656 F.2d at 711. "Although Branzburg may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective criminal law enforcement is absent, that case is not controlling" and the privilege is "readily available." Id. at 711-12 (citing Carey, 492 F.2d at

facts of the particular case, balancing "the public interest in protecting the reporter's sources against the private interest in compelling disclosure." Zerilli, 656 F.2d at 712. See also Carey, 492 F.2d at 636 (opining that courts should "look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired."). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has found that "[a] number of more precise guidelines can be applied to determine how the balance should be struck in a particular case." Zerilli, 656 F.2d at 713.

Specifically, the D.C. Circuit has identified several factors that courts should consider in determining the applicability of the privilege. Id. First, courts should consider whether the information sought "is of central importance" to the litigant's claim or defense. Id. "If the information sought goes to the heart of the matter, that is, if it is crucial to [the litigant's] case, then the argument in favor of compelled disclosure may be relatively strong." Id. (internal citations omitted). If, on the other hand, "the information sought is only marginally relevant, disclosure may be very difficult to justify." Id. The second factor courts should consider is "[t]he effort[] made by the litigant[] to obtain the information from [an] alternative source[]." Id. "Even when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that [s]he has exhausted every reasonable

---

636.). It is worth noting that some courts interpret Branzburg to reject altogether the qualified privilege for reporters in criminal cases. See, e.g., United States v. Smith, 135 F.3d 963, 969-70 (5th Cir. 1998) (finding that in Branzburg the Supreme Court "explicitly rejected a qualified newspapers' privilege shielding confidential source information from grand juries."); Shain v. United States, 978 F.2d 850, 852 (4th Cir. 1992) (stating that "[i]n Branzburg the Supreme Court refused to recognize a reporter's privilege not to testify in criminal prosecutions about relevant evidence known to the reporter, regardless of whether the information was obtained during newsgathering.").

alternative source of information." Id. Finally, courts should take into account whether "the journalist is a party" to the action. Id. at 714. "When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." Id. See also Alexander v. FBI, 186 F.R.D. 21, 49 (D.D.C. 1998). In addition to these factors, Ottaway argues that the Court should also consider whether the "assertion of [the litigant's] claim [itself] is sufficiently 'compelling' to warrant an abridgement of the journalist's First Amendment rights." Mot. to Quash at 8. The Court will consider each of these factors in determining whether the privilege precludes enforcement of Hutira's subpoena to Ottaway.

B.    Applicability of the Journalist's Privilege to Nonconfidential Information

Before deciding whether the privilege merits quashing the subpoena issued to Ottaway, the Court must first determine whether nonconfidential information gathered by a reporter falls within the ambit of the privilege.[4] In the motion to quash, Ottaway does not allege that the documents he possesses were obtained from or contain information related to a confidential source, or that requiring him to be deposed would necessitate divulging confidential information.[5] While the D.C. Circuit has explicitly held that confidential information obtained

---

[4]It is worth noting that the plaintiff does not otherwise contest Ottaway's ability to invoke the privilege. That is, she does not dispute that Ottaway obtained the pertinent information for the purpose of disseminating it to the public, and that he had this intent at the time he obtained the information. Shoen, 5 F.3d at 1293-94. This concession is important since Ottaway (as the proponent of the privilege) has the burden of demonstrating its applicability. Courts engage in the balancing test enunciated above only after the reporter, in this case Ottaway, has demonstrated that the privilege applies. Id. at 1296.

[5]Ottaway does not, however, explicitly state that the information requested by Hutira is nonconfidential. Notwithstanding this fact, the Court assumes, as it must, that the information is nonconfidential since the burden of demonstrating the applicability of the privilege is on the

by reporters during the newsgathering process is covered by the privilege, see Zerilli, 656 F.2d at

705, it has not yet ruled on whether nonconfidential information is similarly protected.

All of the federal circuit courts of appeal that have addressed this question, however, have

concluded that the privilege for journalists shields both confidential and nonconfidential

information from compelled disclosure. See, e.g., Gonzales v. NBC, Inc., 194 F.3d 29, 33-36 (2d

Cir. 1999) ("reaffirm[ing] that the qualified privilege for journalists applies to nonconfidential, as

well to confidential, information."); Shoen, 5 F.3d 1289, 1294 (9th Cir. 1993) (holding "that

the journalist's privilege applies to a journalist's resource materials even in the absence of the

element of confidentiality."); United States v. LaRouche, 841 F.2d 1176, 1182 (1st Cir. 1988)

("discern[ing] a lurking and subtle threat to journalists and their employers if disclosure of

outtakes, notes, and other unused information, even if nonconfidential, becomes routine and

casually, if not cavalierly, compelled."); United States v. Cuthberston, 630 F.2d 139, 147 (3d Cir.

1980) (finding that the disclosure of even nonconfidential materials "may substantially undercut

the public policy favoring the free flow of information that is the foundation for the privilege.").

These courts reason that:

> [i]f the parties to any lawsuit were free to subpoena the press at will, it would
> likely become standard operating procedure for those litigating against an entity
> that had been the subject of press attention to sift through press files in search of
> information supporting their claims. The resulting wholesale exposure of press
> files to litigant scrutiny would burden the press with heavy costs of subpoena
> compliance, and could otherwise impair its ability to perform its
> duties–particularly if potential sources were deterred from speaking to the press,
> or insisted on remaining anonymous, because of the likelihood that they would be
> sucked into litigation. Incentives would also arise for press entities to clean out
> files containing potentially valuable information lest they incur substantial costs in
> the event of future subpoenas. And permitting litigants unrestricted, court-

---

reporter. Shoen, 5 F.3d at 1296.

> enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.

<u>Gonzales</u>, 194 F.3d at 35.

At the same time, however, these courts have also recognized that "the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure." <u>Shoen</u>, 5 F.3dat 1295. <u>See</u> <u>also</u> <u>Cuthbertson</u>, 630 F.2d at 147 (finding that "the lack of a confidential source may be an important element in balancing the [litigant's] need for the material sought against the interest of the journalist in preventing production in a particular case."). In particular, these courts have held that "while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought." <u>Gonzales</u>, 194 F.3d at 36.[6]

In addition to these appellate decisions, at least one judge from this Court has held that the privilege enjoyed by journalists covers both confidential and nonconfidential information. <u>NLRB v. Mortensen</u>, 701 F.Supp 244, 247 (D.D.C. 1988) (Parker, J.). In <u>Mortensen</u>, the NLRB sought to enforce (coincidentally) a subpoena <i>ad testificandum</i> against two reporters from The Washington Post and a reporter from The Atlanta Journal-Constitution. The NLRB argued that the privilege was inapplicable because it only wanted the reporters to confirm that certain identified sources spoke to them and gave certain statements cited in their articles. In concluding

---

[6]In fact, the Second Circuit went so far as to hold that "[w]here a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalist's privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." <u>Gonzales</u>, 194 F.3d at 36.

that the privilege was nonetheless applicable, Judge Parker found that:

> [r]egardless of whether they seek confidential or nonconfidential sources, or whether they seek disclosure or verification of statements, the Board is attempting to examine the reportorial and editorial processes. The fact that their purpose is to support, rather than undermine, the bona fides of the statements as expressed by the reporters makes no difference. Such discovery necessarily implicates the First Amendment interests of the journalists.

Id. at 246. Judge Parker also observed that "a lesser showing of need and materiality is required for discovery of nonconfidential material than for the identity of confidential sources." Id. at 248.

I agree with the aforementioned cases that the qualified privilege afforded to journalists in civil actions by virtue of the First Amendment should apply both to confidential and nonconfidential information. Shoen, 5 F.3d at 1294. While I am not convinced that vitiating the privilege in a particular case would undermine the news gathering process, I am persuaded that the wholesale abrogation of the privilege for nonconfidential information would have a ripple effect felt far beyond any single lawsuit or newspaper article. Gonzales, 194 F.3d at 36. There is little doubt that placing such a limitation on the privilege would undermine the free press that has flourished in and is cherished by this nation. Id. Moreover, because the privilege is intended to protect the press in general and the news gathering process as a whole, rather than a single journalist or the sources used in writing a particular story, the Court must consider the overall effect eliminating the privilege for nonconfidential information would have on the news gathering process. Shoen, 5 F.3d at 1292. Having done so, the Court finds that the privilege applies to nonconfidential information, and, accordingly, Ottaway may invoke it in the instant case.

The Court also finds, however, that the nonconfidential nature of the information sought by Hutira should be considered in determining whether to sustain the privilege in the instant case. Cuthbertson, 630 F.2d at 147. The Court will take this factor into account because journalists have a stronger interest against compelled disclosure of confidential information than they do nonconfidential information. Gonzales, 194 F.3d at 36.

      C.     Enforcing Hutira's Subpoena Against Ottaway

After carefully weighing the factors identified above, the Court concludes that the subpoena issued to Ottaway should be quashed. Specifically, the Court finds that even assuming that the information sought by the plaintiff "is of central importance" to her claims against the Islamic Republic of Iran and the Iranian Ministry of Information and Security[7] and that it is nonconfidential, Hutira has clearly failed to exhaust possible alternative sources of obtaining the pertinent information. Zerilli, 656 F.2d at 713-15. In his motion, Ottaway argues that Hutira "has done the reverse of what the law requires–seeking compelled testimony from the press as a first option rather than a last resort." Mot. to Quash at 11 (emphasis in original). In response, Hutira lists specific things that she has done to try to obtain information related to the assassination of her father. While Ottaway's characterization of Hutira's efforts to obtain the

---

      [7]Although the Court expresses no opinion at this time on whether the information sought by Hutira actually goes to the heart of this action, the Court has little difficulty assuming that it does for purposes of the instant motion. The reason is that in order to obtain a judgment by default, Hutira must prove by evidence satisfactory to the court that the defendants provided material support to the assassin that carried out the (extra-judicial) killing of Tabatabai. 28 U.S.C. § 1608(e); 28 U.S.C. § 1605(a)(7). By issuing a subpoena to Ottaway, Hutira appears to be trying to do just that. Ottaway's article entitled "The Lone Assassin" identifies Daoud Salahuddin as the killer, describes the Iranian government's role in the assassination (including the monetary assistance that it gave Salahuddin), and provides a fairly detailed account of how the murder was carried out. These facts appear to go to the heart of Hutira's claims against the defendants and do not seem to be only tangentially related to her case.

information from alternative sources is an overstatement, the Court agrees that the plaintiff should pursue other means of securing the information before seeking to obtain it from Ottaway. In particular, Hutira should (at a minimum) attempt to contact the other individuals discussed in the article, some of whom may still live near Washington, D.C., before trying to depose Ottaway or get him to produce pertinent documents. Zerilli, 656 F.2d at 714-15.  In reaching this conclusion, the Court is well aware that the plaintiff may have considerable difficulty obtaining the information based on the timing of the relevant events.  This difficulty does not, however, relieve Hutira of trying initially to obtain the information elsewhere.  The Court concludes that this factor weighs so heavily in favor of quashing the subpoena, that it does not need to address the other factors specifically.[8]

D.    Admissibility of the Article

In the motion to quash, Ottaway argues that the subpoena is "completely unnecessary"

---

[8]It is worth noting, however, that Ottaway's non-party status does not appear to weigh heavily against compelled disclosure.  The reason is that courts have typically used this factor as a justification for abrogating the privilege when the reporter is a party to the action rather than as a reason for preserving it when the reporter is not a party to the underlying action.  See, e.g., Carey, 492 F.2d at 636-39.

In addition, there appears to be significant problems with Ottaway's contention that Hutira's cause of action is itself not important enough to merit vitiating the privilege.  First, the Court was unable to find any case in this circuit that suggests that it should appraise the underlying civil action so as to decide whether it is worth abrogating the privilege.  Second, even if this Court were inclined to engage in such a subjective valuation, the instant case appears to be one in which the public has a strong interest in disclosure.  As this Court noted in Elahi v. The Islamic Republic of Iran, 124 F.Supp.2d 97, 106 (D.D.C. 2000), Congress abrogated the sovereign immunity of nations designated as state sponsors of terrorism, such as the Islamic Republic of Iran, "to deter terrorist acts against U.S. nationals by foreign sovereigns or their agents and to provide for justice for victims of such terrorism."  There is no question that the public has a stake in deterring future terrorist attacks and in compensating victims of past acts.  Moreover, Hutira's case seems particularly important in light of the fact that it is based on a terrorist act that occurred on American soil.

because the article itself should be admitted into evidence and given its full probative value. Mot. to. Quash at 10-11. Ottaway contends that even though the article is hearsay and would ordinarily be inadmissible, it should be admitted into evidence in this case since the defendants have failed to enter an appearance and thus will not object to the article's admission at trial. Id. (citing United States v. Hernandez, 780 F.2d 113, 118 n.4 (D.C. Cir. 1986), for the proposition that evidence is admissible, notwithstanding the fact that it is hearsay, if the opposing party fails to object.). Apparently seizing on Ottaway's argument, plaintiff notes in her response brief that if the Court rules that the article is admissible and that by itself it constitutes evidence satisfactory to the court, then this subpoena and any future subpoena for Ottaway would be unnecessary. Pl.'s Response at 5-6. If the Court accepts the article as satisfactory evidence, the plaintiff would be ready to proceed with the hearing pursuant to 28 U.S.C. § 1608(e). The Court will address the admissibility of "The Lone Assassin" because it will necessarily effect the manner in which the plaintiff proceeds in establishing her claim or right to relief.

While this argument by Ottaway and Hutira is superficially appealing, the Court finds that there are several reasons why it must ultimately fail. First, there is no doubt that the newspaper article is hearsay[9] and that it would ordinarily be inadmissible. See, e.g., Eisenstadt v. Allen, 113 F.3d 1240 (9th Cir. 1997) (finding that "newspaper articles clearly fall within the definition of hearsay . . . and, thus, are inadmissible.") (internal citation omitted). Hutira is clearly attempting to use the article to prove the truth of the matters asserted therein–namely that the

---

[9]The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Ev. 801(c). Federal Rule of Evidence 802 provides that hearsay is generally inadmissible.

Islamic Republic of Iran and the Iranian Ministry of Information and Security provided material support to Salahuddin.

Second, allowing the article into evidence based on the defendants' failure to object in this case would clearly undermine the purpose of excluding hearsay in general and 28 U.S.C § 1608(e) in particular. Evidence constituting hearsay is normally inadmissible because it lacks sufficient guarantees of reliability. See, e.g., Arthur Best, Evidence: Examples and Explanations at 61 (2nd Edition) (noting that "the reliability problems of out-of-court statements are thought to be so great that common law decisions and the Federal Rules of Evidence take the position that a rule of exclusion will produce the fairest results overall."). In accordance with this principle, courts have specifically found that "[u]nsupported newspaper articles usually provide no evidence of the reporter's perception, memory or sincerity and, therefore, lack circumstantial guarantees of trustworthiness." Eisenstadt, 113 F.3d at 1240. See also United States v. Harris, 271 F.3d 690, 696 (7th Cir. 2001) (noting that "daily newspapers are not reliable evidentiary sources."). Moreover, 28 U.S.C. § 1608(e) requires plaintiffs to prove their claim or right to relief by evidence that is satisfactory to the court before a judgment of default may be entered. It would be wholly inappropriate to permit Hutira to satisfy the requirement of 28 U.S.C. § 1608(e) by submitting an unsubstantiated newspaper article.[10] Allowing Hutira to do so would effectively render the statutory provision meaningless. Cf. The Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241-42 (2d Cir. 1994) (noting that while this provision does not require the

---

[10]In this regard, the Court finds "The Lone Assassin" distinguishable from newspaper articles that simply recount basic events such as the weather. See, e.g., United States v. Wilson, 913 F.2d 136, 139 (4th Cir. 1990) (finding no error in admitting into evidence a newspaper article that reported on a tornado).

plaintiff to provide more evidence than would otherwise be necessary, the plaintiff must support its allegations by sufficient evidence.).

Finally, newspaper articles are readily distinguishable from the documentary and affidavit evidence that courts frequently have admitted into evidence in ex parte hearings conducted under 28 U.S.C. § 1608(e). See, e.g., Weinstein v. The Islamic Republic of Iran, 184 F.Supp.2d 13 (D.D.C. 2002). Affidavits, though usually not admitted into evidence in ordinary trials, are allowed in hearings conducted under 28 U.S.C. § 1608(e) since the hearings are ex parte. That is, courts have found that there is no reason to require live witness testimony in these hearings because the defendants have failed to enter an appearance in the actions, and, accordingly, would not be there to cross-examine the affiant in open court. See, e.g., Weinstein v. The Islamic Republic of Iran, 175 F.Supp.2d 13, 17 (D.D.C. 2001). In allowing plaintiffs to satisfy the requirements of 28 U.S.C. § 1608(e) by submitting affidavits, courts have never doubted the veracity of the factual information attested to in the affidavits. See, e.g., Antoine v. Atlas Turner, Inc., 66 F.3d105, 111 (6th Cir. 1995) (noting that the "[u]se of affidavits in granting default judgments does not violate either due process of the FSIA."); Weinstein, 184 F.Supp.2d at 19 (permitting the plaintiff to rely on affidavits). As the Seventh Circuit observed in the context of summary judgment motions, however, "[t]here is no similar dispensation for newspaper or magazine articles, which not being attested are considered less reliable than affidavits or depositions." Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997). The distinction between affidavits and newspaper articles appears particularly appropriate in this case since the author of "The Lone Assassin" has expressly declined to attest to the veracity of the facts detailed in his article. See Glen Weissenberger & James J. Duanne, Federal Evidence at 406-07 (4th

-14-

Edition) (noting that "the hearsay system excludes much evidence which is relevant but is flawed due to the fact that the evidence is inherently untrustworthy in such a way that the trier of fact would be incapable of attributing weight to the evidence."). Thus, the Court concludes that the article entitled "The Lone Assassin" does not satisfy the requirements of 28 U.S.C. § 1608(e).

### III.  CONCLUSION

For the foregoing reasons, the Court finds that the subpoena issued to Ottaway should be quashed.  Specifically, the Court finds that Hutira has not made a sufficient effort to obtain the information from an alternative source.  In accordance with this conclusion, the Court will postpone the hearing currently scheduled in this case for July 12, 2002, to provide the plaintiff additional time to obtain information that will establish her claim or right to relief in a manner satisfactory to the Court.

A separate order shall issue this date.

Date:  _7 - 9 - 0 2_

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge